IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,<br><br>    Plaintiff,<br><br>    v<br><br>CENTRAL GARDEN AND PET COMPANY, et al,<br><br>    Defendants.<br>_____/ | No   C 06-3924 - VRW<br><br>ORDER |

        On June 23, 2006, plaintiff and counterdefendant The Insurance Company of the State of Pennsylvania ("ICSOP") filed this diversity action against defendants and counterclaimants Central Garden and Pet Company ("Central Garden") and Federal Insurance Company ("Federal"), seeking reimbursement for funds paid to Central Garden following the alleged exhaustion of ICSOP's insurance policy.  Doc #1.  The parties have filed cross-motions for summary judgment.  Doc ##33, 41, 43.  For reasons discussed below, the court GRANTS ICSOP's motion for summary judgment, DENIES Central Garden's motion for summary judgment and DENIES Federal's motion for partial summary judgment.

I

A

The parties agree that facts relevant to the present motions are undisputed. On August 2, 2000, a fire destroyed a warehouse in Phoenix, Arizona. Doc #32 (Friedrich decl), ¶¶ 2, 8. At the time of the fire, B&L Properties owned the warehouse and leased the space, in part, to Central Garden, and in remaining part to Cardinal Health, Inc ("Cardinal"). Id, ¶ 8. The fire allegedly resulted from the combustion of pool treatment chemicals stored in the Central Garden portion of the warehouse. Id, ¶ 9.

At the time of the Phoenix warehouse fire, Central Garden retained liability insurance from four insurers that afforded primary, umbrella and excess liability coverage as set forth below:

| Insurer | Type of Coverage | Policy Number | Policy Limits |
|---|---|---|---|
| Fireman's Fund Insurance Company ("FFIC") | Primary Liability | S 95 DXX 80758493 | $1,000,000 per occurrence; $2 million in the aggregate |
| ICSOP | Umbrella Liability | 4700-6498 | $20,000,000 per occurrence and in the aggregate |
| Federal | Excess Liability | 7931-92-47 | $20,000,000 per occurrence and in the aggregate |
| RLI Insurance Company ("RLI") | Excess Liability | RXU0202865 | $10,000,000 per occurrence and in the aggregate |

Following the fire, a number of parties initiated lawsuits against Central Garden. Nearby residents filed a purported class action lawsuit against Central Garden, claiming bodily injury and property damage from smoke, fumes and chemical runoff from the fire. Cardinal sued for, among other things, destruction of its property stored at the warehouse. Vittorino

2

decl, Ex B. B&L filed a complaint arising out of the destruction of the warehouse. Vittorino decl, Ex C. Also, some surrounding businesses brought suit for losses relating to the fire. These lawsuits were initially defended by FFIC under its primary liability insurance contract. Friedrich decl, ¶ 12.

In January 2004, FFIC and ICSOP agreed on behalf of Central Garden to fund a settlement of the bodily injury and property damage claims in the actions brought by the residents for a total of $7,825,000. Vittorino decl, ¶ 5. That settlement exhausted FFIC's primary policy limits. Id. ICSOP contributed $5,897,823 to the settlement. Id. Following exhaustion of FFIC's primary limits, ICSOP assumed Central Garden's defense in the pending lawsuits by B&L, Cardinal and those actions brought by surrounding businesses that had not been settled by FFIC prior to exhaustion of its limits. Id, ¶ 6. With Central Garden's approval, ICSOP funded settlements of the remaining suits brought by the surrounding business, thereby eroding ICSOP's remaining policy limits by an additional $711,839. Id.

On January 17, 2006, Central Garden and two other defendants, Arch Chemicals, Inc and Olin Corporation (collectively "Arch"), affiliated manufacturers of the pool treatment chemicals stored at the Central Garden warehouse, entered into an "Agreement to Settle and Arbitrate" in which Central Garden and Arch agreed to fund a settlement of Cardinal's claims. Id, Ex D. The Central Garden and Arch agreement contemplated a subsequent mediation with the Cardinal plaintiffs. Id, Ex D, ¶ 1. If a settlement with the Cardinal plaintiffs were achieved in the mediation, the Central Garden and Arch agreement called for equal shares in initial

3

funding responsibility subject to a subsequent allocation arbitration to determine the ultimate allocation of the settlement amount paid to the Cardinal plaintiffs as between Central Garden and Arch.  Vittorino decl, Ex D, ¶ 4.  The agreement provided for a floor and ceiling on the respective comparative fault of Central Garden and Arch as determined by the arbitration.  Id.

At a January 25, 2006, mediation, the Cardinal plaintiffs reached an agreement with Central Garden and Arch on the amount to be paid to the Cardinal plaintiffs.  CG counterclaim ¶ 29; Federal counterclaim ¶ 12.  On March 10, 2006, at Central Garden's direction, ICSOP contributed the remaining portion ($13,390,338) of its $20,000,000 stated policy limits toward the funding of the payment to the Cardinal plaintiffs.  Vittorino decl, ¶ 9.  Federal paid the balance of Central Garden's required funding.  On March 13, 2006, Cardinal provided the final signature on a "Confidential Settlement and Release Agreement," whereby the parties, including Cardinal, Central Garden and Arch, released all claims against each other and agreed to dismiss the Cardinal action and cross-actions with prejudice.  Vittorino decl, Ex D.  The contemplated dismissals were filed on March 27, 2006, and the action was dismissed with prejudice on April 6, 2006.  Id, Ex E & F.

The agreed floor and ceiling imposed on any recovery by Central Garden or Arch pursuant to the allocation arbitration precluded ICSOP from receiving any reimbursement for the $13,390,338 it paid toward the Cardinal settlement.  As a result, on March 21, 2006, ICSOP advised Central Garden and Federal that ICSOP would not pay fees or costs incurred after March 10, 2006, to administer the terms of the Central Garden-Arch reallocation

4

arrangement with respect to the Cardinal settlement. Vittorino decl, ¶ 12. On March 28, 2006, ICSOP also advised Central Garden and Federal that ICSOP would not pay fees or costs incurred after March 10, 2006 to further defend the B&L action. Vittorino decl, ¶ 12.

In response, Federal demanded that ICSOP fund all post-settlement costs in connection with the Cardinal action. Vittorino decl, ¶ 13. Central Garden also insisted that ICSOP continue paying fees and costs to administer the Cardinal settlement and to defend the B&L action. Vittorino decl, ¶ 14. In light of this dispute, ICSOP paid Central Garden's expenses to conduct the allocation arbitration and is continuing to defend the B&L action pending the present motions. Id. Since March 10, 2006, the date ICSOP's policy allegedly was exhausted, ICSOP has paid in excess of $600,000 on Central Garden's behalf in connection with the allocation arbitration and administering the Cardinal settlement and more than $70,000 defending Central Garden in the B&L action. Id, ¶ 15. The allocation arbitration began on July 10, 2006. A decision in the arbitration was rendered on August 11, 2006.

B

Basing federal jurisdiction on diversity, ICSOP filed the instant lawsuit against Central Garden and Federal on June 23, 2006, seeking reimbursement of post-exhaustion payments to Central Garden and declaratory relief. Doc #1. On July 24, 2006, Central Garden filed counterclaims for breach of contract and declaratory relief. Doc #10. On September 1, 2006, Federal filed

counterclaims for equitable subrogation and unjust enrichment.  Doc #19.  The parties have presently filed cross-motions for summary judgment.  Doc ##33, 41, 43.

II

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v Liberty Lobby</u>, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  <u>Celotex Corp v Catrett</u>, 477 US 317, 322-23 (1986).  When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.  <u>Calderone v United States</u>, 799 F2d 254, 258-59 (6th Cir 1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists.  <u>TW Elec Serv v Pacific Elec Contractors Ass'n</u>, 809 F2d 626, 630 (9th Cir 1987).  The evidence presented by the nonmoving party "is to be

6

believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 US at 255.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id at 249.

### III

The cross-motions for summary judgment concern two related issues:  (1) whether ICSOP's policy requires it to pay pre-judgment interest in excess of policy limits and (2) whether ICSOP's duty to defend Central Garden continued after ICSOP contributed the remaining portion of its policy limits pursuant to the parties' agreement to settle and arbitrate.

As a preliminary matter, the court notes the parties' dispute concerning choice-of-law.  In a diversity action, the court "must apply the same choice of law analysis that would be applied by state courts in the jurisdiction in which the district court is situated."  Liew v Official Receiver & Liquidator, 685 F2d 1192, 1195 (9th Cir 1982) (citing Klaxon Co v Stentor Electric Manufacturing Co, 313 US 487, 496 (1941)).  The court declines the parties' invitation to plod through the "government interest test" because it finds (and the parties at argument agreed) that Arizona and California law do not materially differ with respect to the present motions.  Estate of Darulis v Garate, 401 F3d 1060, 1062 (9th Cir 2005).

//
//
//

7

A

Under California and Arizona law, the overarching goal in interpreting an insurance contract is to give effect to the "mutual intention of the parties." Waller, 11 Cal 4th at 18 (internal citations omitted). To do so, courts first look to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. Id (citing Cal Civ Code § 1638); Canadian Indem Co v Heflin, 151 Ariz, 257, 258 (App Div 1986) ("When interpreting the language of an insurance policy, the courts will construe the policy's terms in accordance with their plain and ordinary meaning."). If the policy language is clear and explicit, it governs. Waller, 11 Cal 4th at 18; Cal Civ Code § 1639 (internal citation omitted). If, however, the contractual language permits two or more reasonable constructions, courts resolve the ambiguity by looking to the "objectively reasonable expectations of the policy holder." Montrose Chem Corp v Admiral Ins Co, 10 Cal 4th 645, 666-67 (1995); Bay Cities Paving Grading, Inc v Lawyers' Mutual Ins Co, 5 Cal 4th 854, 867 (1993). Finally, if the ambiguity is not resolved by the "reasonable expectations" approach, courts interpret the ambiguity against the drafter (the insurer). AIU Ins Co v Superior Court, 51 Cal 3d 807, 822 (1990) (citing Cal Civ Code § 1654). Under California and Arizona law, interpretation of an insurance policy is a question of law. Waller v Truck Ins Exchange, Inc, 11 Cal 4th 1, 18 (1995); Canadian Indem Co v Heflin, 151 Ariz 257, 258 (App Div 1986).

The dispute over payment of pre-judgment interest concerns the following term in ICSOP's policy:

//

> **We will pay the following:**
>
> *** * ***
>
> **Pre-judgment interest awarded against the insured on that part of the judgment we pay.  If we make an offer to pay the applicable limit of the insurance, we will not pay any pre-judgment interest based on that period of time after the offer.**

**Vittrioni decl, Ex A at 3 (ICSOP's policy form).**

According to ICSOP, this term requires ICSOP to pay pre-judgment interest in addition to policy limits if pre-judgment interest is awarded by a court upon entry of judgment.  Doc #43 at 10.  Both Federal and Cental Garden disagree with ICSOP and find the term ambiguous.

Federal insists that ambiguity results from reading the two sentences separately.  Under this interpretation, the first sentence relates to ICSOP's obligation to pay pre-judgment interest in connection with a judgment against the insured and the second sentence relates to all other instances in which the insured becomes obligated to pay after it has offered policy limits.  Doc #41 at 6. Focusing on the second sentence, Federal reasons that by carving out the duty to pay pre-judgment interest *after* ICSOP offers policy limits, ICSOP obligated itself to pay pre-judgment interest *prior* to offering policy limits.  Id at 7 (citing "the principle of *inclusio unius est exclusio alterius*").

Despite being cloaked in a Latin maxim, Federal's argument amounts to a logical fallacy.  In essence, Federal reasons that if an offer to pay forecloses pre-judgment interest, then the absence of an offer should provide for pre-judgment interest.  Rather than a rule of interpretation, Federal's theory simply confuses necessary and sufficient conditions:  namely, that an offer to pay policy

9

limits is sufficient to preclude pre-judgment interest does not render it necessary to preclude such interest. Hence, ICSOP's term does not imply the broad availability of pre-judgment interest in excess of policy limits.

The court finds compelling ICSOP's alternative interpretation (almost walked away from at argument) of the disputed second sentence: the term refers to circumstances in which ICSOP offers to pay its limits toward a settlement that is not consummated, and instead the case goes to verdict with an award of pre-judgment interest. Doc #60 at 17. The second sentence then obviates ICSOP's duty to pay pre-judgment interest accruing after ICSOP made its offer. Id.

Central Garden takes a different tack in its contention that the pre-judgment term is ambiguous. First, Central Garden faults ICSOP for not "clearly exclud[ing] the payment of pre-judgment interest on settlements." Doc #33 at 22. But this critique reads the term in the abstract, disregarding the insurance policy as a whole. See Bank of the West, 2 Cal 4th at 1265 ("Language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."). The insurance policy makes clear at the outset that ICSOP's policy limit per occurrence and in the aggregate is $20,000,000. Given this context, the term providing pre-judgment interest in excess of policy limits constitutes an exception to the insurance policy's default rule. If the exception does not apply, the default governs. Central Garden's position would thus impose a duty on ICSOP to specify every non-exception to the policy's default. The court declines to impose such an unreasonable burden.

10

Next, Central Garden asserts that the term "judgment" lacks clear definition. Doc #33 at 23. "A layperson," according to Central Garden, "would reasonably interpret the provision to require the payment of pre-judgment interest on both jury verdicts and settlements." Id. The court disagrees. Under its plain meaning, the term judgment denotes a formal decision or determination by a court of law or other tribunal. A layperson would not consider a private settlement to be a judgment. See also Great West Casualty Company v Barnick, 529 N W 2d 504, 505 (Minn App 1995) (concluding that "the term 'prejudgment interest' presupposes there was a judgment" from a court). Accordingly, with respect to the present motions, the court finds no ambiguity in the term judgment. See Reserve Ins Co, 30 Cal 3d at 807 ("Courts will not strain to create an ambiguity where none exists.").

Finally, Central Garden argues the proceedings leading up to the settlement with the Cardinal plaintiffs amount to a judgment under ICSOP's policy. In early 2005, the Cardinal plaintiffs moved for partial summary judgment that Central Garden was negligent per se in connection with the August 2, 2000, fire. Soon thereafter, Central Garden stipulated to judgment on this issue. Doc #34, Ex A at 2. According to Central Garden, this "judgment" made it "virtually certain that [it] would be held liable for compensatory damages, and that it would also be required to pay pre-judgment interest on those damages." Doc #67 at 13. But Central Garden's prediction that it would pay pre-judgment interest is of no consequence. Although the expected imposition of pre-judgment interest likely affected the settlement amount, that does not mean a portion of the settlement actually constitutes pre-judgment

11

1 interest.  See <u>Liimatta v Likkari</u>, 185 Mich App 144, 145 (1990) ("By
2 accepting a settlement before judgment, a party trades off the loss
3 of interest during the waiting period in exchange for the certainty
4 of settlement.")

5          Central Garden and Federal both cite <u>Tucker v United
6 States Services Automobile Ass'n</u>, 827 P 2d 440 (Alaska 1992), for
7 the proposition that courts have interpreted language similar to
8 that in the ICSOP contract as requiring an insurer to pay pre-
9 judgment interest on settlements.  But <u>Tucker</u> does not support such
10 a proposition.  In <u>Tucker</u>, an insurer offered its "policy limits" to
11 settle a negligence suit arising out of an automobile accident.  Id.
12 In resolving the parties' dispute over the meaning of the term
13 "policy limits," the Alaska court held that the insurer obliged
14 itself "to pay its maximum potential liability available under the
15 policy," which included pre-judgment interest.  827 P 2d at 440.
16 Within the context of the parties' settlement, the court construed
17 the term "policy limits" to be the amount available "if the case had
18 proceeded to trial."  Id at 441 n4.  The inclusion of pre-judgment
19 interest thus followed from this construction.  In the present
20 action, however, there is no settlement promise that compels the
21 court to find the maximum potential liability under the insurance
22 policy.

23          Accordingly, the court concludes that ICSOP's policy does
24 not oblige ICSOP to pay pre-judgment interest in excess of policy
25 limits due to the parties' settlement.
26 //
27 //
28 //

**12**

**B**

The crux of the second dispute contained in the parties' cross-motions for summary judgment is whether ICSOP had a duty to defend Central Garden in the allocation arbitration and the B&L action.

ICSOP's policy provides that it "will not defend any claim or suit after [ICSOP's] applicable Limits of Insurance have been exhausted by payment of judgments or settlements." Vittorino decl, Ex A at 3. Despite this policy language, Central Garden and Federal insist that ICSOP had a duty to defend Central Garden in the allocation arbitration and the B&L action even though ICSOP paid its $20,000,000 policy limit toward settlements on Central Garden's behalf. This duty allegedly continued after exhaustion because Central Garden's liability for the Cardinal plaintiffs' claims was not finally determined until the arbitrators rendered their decision on August 11, 2006.

Pursuant to the agreement to settle and arbitrate, Central Garden and Arch funded the Cardinal settlement on a 50/50 basis and then submitted to the allocation arbitration for the sole purpose of reallocating fault between Central Garden and Arch. Vittorino decl, Ex D, ¶ 1. This arbitration had no bearing on Central Garden's obligations to the Cardinal plaintiffs; indeed, pursuant to the agreement to settle and arbitrate, the Cardinal action was dismissed with prejudice in its entirety. Id. Central Garden portrays the arbitration as "a continuation of the Cardinal action," Doc #33 at 13, but this belies the arbitration's limited purpose: to adjust settlement contributions between Central Garden and Arch. See id, Ex D, ¶ 4. More significantly, the agreed ceiling imposed on any

13

1 recovery by Central Garden or Arch precluded ICSOP from receiving
2 any reimbursement for the $13,390,338 it paid toward the Cardinal
3 settlement.  The only insurer whose interests could be affected by
4 the allocation arbitration was Federal.

5   If, as here, an insurance policy expressly provides that
6 the duty to defend terminates upon exhaustion of policy limits, and
7 the insurer pays out its policy limits in the payment of settlements
8 or judgments (as opposed to "tendering its limits" to a court in a
9 ploy to exhaust a policy before a settlement or judgment is
10 entered), the insurer's defense obligations extinguish, and an
11 insurer is entitled to withdraw from the defense of claims.  See, e
12 g, <u>Hartford Accident & Indemnity Co v Superior Court</u>, 23 Cal App 4th
13 1774, 1780-81 (1994); <u>Johnson v Continental Ins Cos</u>, 202 Cal App 3d
14 477 (2d Dist 1988); <u>Continental Cas Co v Farmers Ins Co of Ariz</u>, 180
15 Ariz 236, 239 (App Div 1994); <u>California Cas Ins Co v State Farm Mut
16 Auto Ins Co</u>, 185 Ariz 165, 169 (App Div 1996).  See also <u>Haskel, Inc
17 v Superior Court</u>, 33 Cal App 4th 963, 977 (1995) ("The defense duty
18 arises upon tender of a potentially covered claim and lasts until
19 the underlying lawsuit is concluded, or until it has been shown that
20 there is no potential for coverage.").

21   Central Garden cites one case, <u>California Casualty Ins Co
22 v State Farm Mutual Auto Ins Co</u>, 185 Ariz 165 (Ariz Ct App 1996),
23 for the proposition that "an insurer must continue defending its
24 insured until the insured obtains a complete release, even if the
25 insurer has paid out its policy limits."  Doc #33 at 18.  But
26 <u>California Casualty</u> addressed a different issue:  whether the
27 insurer's payment of its policy was "by itself sufficient to
28 discharge its contractual duty to defend."  185 Ariz at 169.  The

**14**

court declined to discharge the insurer's duty to defend until the insured was released from liability. Id. Here, Central Garden received more than mere payment of ICSOP's policy; Central Garden obtained settlement and *release* from the Cardinal plaintiffs. This release absolves ICSOP from its duty to continue defending Central Garden.

Interpreting the policy in this manner also provides for a more efficient allocation of defense responsibilities. Obliging ICSOP to pay for defense until the potential for indemnity ends ensures ICSOP will defend Central Garden with an incentive to minimize liability. Severing the duty to defend from the duty to indemnify, by contrast, creates a serious conflict of interest: an insurer with no indemnity obligation will seek to minimize litigation costs without regard for the amount of liability. The court cannot find that the parties contemplated such a result.

Accordingly, the court declines to force ICSOP to assume a contractual obligation that ICSOP did not agree to provide. ICSOP did not have a duty to defend Central Garden during the arbitration or through the resolution of the B&L action.

//
//
//
//
//
//
//
//
//

IV

In sum, the court concludes that ICSOP's policy limits were exhausted on March 10, 2006, absolving ICSOP of defense or indemnity obligations to Central Garden. Accordingly, the court GRANTS ICSOP's motion for summary judgment, DENIES Central Garden's motion for summary judgment and DENIES Federal's motion for partial summary judgment. Central Garden must reimburse ICSOP for payments it made on Central Garden's behalf for defense costs incurred after March 10, 2006.

Pursuant to 28 USC § 636(b)(1)(A) and FRCP 72(a), IT IS HEREBY ORDERED that this case be referred to the chief magistrate judge or his designee to conduct such proceedings, including evidentiary hearings, as necessary and appropriate to determine the amount ICSOP has paid on Central Garden's behalf in connection with the allocation arbitration and the B&L action. The magistrate judge shall conclude these proceedings or report to the court on the status of matters no later than February 28, 2007. Counsel will be advised of the date, time and place of appearance by notice from the assigned magistrate judge.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge